HAZEL HOWE RUSHMORE, complainant-appellant,

*v.*

SAMUEL WILLIS RUSHMORE, defendant-respondent.

[Submitted May 26th, 1933. Decided September 27th, 1933.]

On appeal from a decree of the court of chancery advised by Advisory Master Reed, who filed the following opinion:

"This is a suit for maintenance under the statute. The bill of complaint was filed April 25th, 1931. Complainant and defendant were married April 15th, 1929. Both have been married before. The defendant was a widower and the complainant had obtained a divorce from her first husband. She had two children by her first marriage, but none of this union.

"It is unnecessary to refer in detail to the evidence of violence and abuse which complainant claims to have suffered at the hands of the defendant. I shall mention only a few instances. She relates that on the third day of their honeymoon, apparently because she remonstrated with him when he cursed the memory of his first wife, defendant choked and struck the complainant, beat her over the head and struck her face and neck with his firsts and continued until, to use her own words, 'well, toward morning he was tired. Then about two or three o'clock, he calmed down and I retired to my bed and the last I remember was lying on the bathroom floor and Mr. Rushmore striking me.' About ten days later,

while at Atlantic City, complainant left the defendant, not because of any violence exhibited toward her but because defendant said he found her pouting and disagreeable and wished that she would leave him. She went to New York and he followed her there within a day or two and invited her to his room in the Pennsylvania hotel, where he struck her repeatedly and beat her. The couple went west in June, 1929. While there several unpleasant incidents occurred and after their return to Plainfield and on complainant's birthday in 1929, they went to dinner at the Hotel Weston and spent the night there. The next morning she says defendant took her by the shoulders, shook her, spit in her face and knocked her down so that she fell over some suitcases and as a result she suffered a miscarriage. She did not trouble to call a physician, however, but went to Philadelphia, where she visited with her children, who were in school near there.

"In addition to his physical violence, she says he subjected her to verbal abuse. He disapproved of her drinking; called her a drunkard and unchaste; accused her of intimacy with other men.

"From the date of the marriage until February 4th, 1931, the couple was separated and reunited on at least three occasions. On the last mentioned date she says he beat her so severely that she left his home and separated herself from him.

"This recital of violence in word and deed is all denied by defendant, although he does admit he spanked her on one occasion and called her a drunken bum on another.

"Both complainant and defendant seem to be temperamental. The defendant, sixty years old at the time of his marriage, had fixed ideas as to how his wife should behave and strongly resented her indifference to his opinion. The complainant, accustomed to deciding such matters for herself, has strongly resented his criticism. These differences of outlook led to frequent clashes. Complainant's actions exasperated the defendant; defendant, in his exasperation, was not only unreasonable but unpleasant.

"Whether or not his conduct constituted such cruelty as

would justify the complainant in leaving him, I need not determine in view of the conclusion at which I have arrived with regard to the incident of February 15th, 1931.

"On February 13th, 1931, in an effort to get some papers belonging to her through the butler employed by her husband, complainant became convinced that a trap had been set for her and therefore refused to keep an appointment with the butler. On the following day she says she received a telephone call from her husband's physician in which she was informed that the defendant was very ill, that his leg was ulcerated and that it might be necessary to amputate it. On February 15th, 1931, she went from New York, where she was staying with her mother, to the home of defendant in Plainfield. Defendant was in bed, but after the first greetings were over and she had told him that she would return to New York, she found that he had hidden her coat and hat. He became very violent, she says, but about dusk she found the hidden articles and started to leave the house. The defendant followed her to the front door in his pajamas and stood calling after her, accusing her of always running away and with living with other men and she thinks he used the expression, 'get out, you awful woman.' Although she was then half a block from the house and had successfully made her escape she returned to him. From that point her account of what occurred differs in her original examination from that in rebuttal in some particulars. For instance, on direct examination she says: 'I stayed there that night and then the next morning Dr. Glass came and Dr. Glass was in the bedroom when I entered the room. I greeted him and asked him if he was going to dress Mr. Rushmore's leg, said I wished to see it, and Mr. Rushmore said, "I object. I will not have her—I will not let you dress my leg while she is in the room," and I said, "very well, Sam, if you don't let me see your leg, then I am leaving." And I left the room and left the house.'

"On cross-examination she said she found Mr. Rushmore in the bedroom with his leg bound up. She put her arm around his neck and kissed him and later in the evening the butler came into the room while she was resting on the side

of the bed with Mr. Rushmore's arm around her. She spent the night in that bed, but had no intercourse. Next morning when the butler brought breakfast Mr. Rushmore was in bed but she was 'up and dressed.'

"The defendant in his testimony says that complainant, dressed in a pair of his pajamas, occupied the bed with him and that intercourse occurred.

"Franeson, the butler, called in behalf of the defendant, testifies that while he was in Mr. Rushmore's room, Mrs. Rushmore telephoned to her mother, saying, 'Mother, I am staying here in the house with Sam.' That he brought a glass of orange juice to Mr. Rushmore later and then Mrs. Rushmore was lying in the left arm of Mr. Rushmore and that Mr. Rushmore said, 'it is all right, Hermann, everything is all right.' Next morning he took breakfast to Mr. Rushmore's room for both of them and that Mr. Rushmore was in bed and Mrs. Rushmore in the bathroom; that both had their breakfast in the bedroom.

"In rebuttal, the complainant, relating the incident of February 15th and 16th, 1931, says, 'I went out there to satisfy myself—to see what Mr. Rushmore's condition was. * * * I went out expecting to stay over from one train to the next and I started to leave at one time but Mr. Rushmore acted so badly that I stayed a little longer and thought, well, I would get out of the house when he was unaware of it and so avoid a scene, and, when I tried to go, I was unable to find my hat or coat or purse, and, very late in the night when—when I would question—when I would ask about these things, everyone would deny knowing anything about it, and, later in the night, I tried to telephone for a taxi and the downstairs 'phone was disconnected and the only 'phone that was in use was beside Mr. Rushmore's bed. Well, I spent a great many hours looking for my things, still trying to get out of the house, and I sat on the side of Mr. Rushmore's bed and talked to him for a while and I did throw myself down on top of his bed, fully clothed, and, finally, fell asleep there for a couple of hours. Early in the morning I got up and continued to prowl around the house and look for my

things. Finally, almost noon the following day, I found them hidden under an office desk in Mr. Rushmore's den.'

"She says she did not undress that night at all; that defendant's leg was bandaged and elevated on pillows all night, but it was her belief that the bandage was a fake and that he had no trouble with his leg. It is conceded, I think, that the condition in question was serious in its implications rather than in its immediate consequences.

"There is evidence that there were at least two other bedrooms in the house, either of which complainant might have occupied.

"As has been said, these two people were very temperamental. They had their affectionate moments and moments in which they were violently angry at each other. They could not get along for any length of time without a display of temper on the part of one or both. The reaction from these storms was almost always reconciliation. If complainant's first version of the events of the evening is true, they had a storm during which Mr. Rushmore followed her to the front door and shouted abuse and accusations after her. But she returned and later she is lying on the bed beside him with his arm around her. He had been violent, he was then calm, and she accepted his caresses. Was her acceptance feigned or real? If it was real, then it would seem natural that the complainant and defendant should resume their relations as husband and wife. I am convinced that they did so and that under the decisions of this state the complainant thereby condoned any act of cruelty which had preceded that date.

"It is argued on behalf of the complainant that intercourse on a single occasion does not constitute condonation. Yet, in the case of *McGovern* v. *McGovern, 111 N. J. Eq. 18,* this court expressed a different view. In that case, the facts were that the husband in response to the suggestion of his wife visited her at her apartment in an effort to accomplish the reconciliation, which they then and there agreed upon. They spent the night together and to make that pact binding had intercourse. The wife, however, did not thereafter carry out the agreement. There was but that single instance of inter-

course. Vice-Chancellor Buchanan said: "There was a complete desertion and an immediate right of action thereof, subsequent to which there was a condonation by petitioner.'

"That brings us to the consideration of whether or not the subsequent actions of the defendant were such as to destroy the effect of the condonation. I think not. Nothing occurred on the morning of February 16th, 1931, of which complainant could properly complain. Defendant was within his right in demanding that she leave the room while his leg was being dressed and if in her anger she left his house he should not be held responsible for her departure. During the following months, and even after the suit was brought, he made effort to persuade complainant to return to him. It is true that in his letters he criticized her conduct and made reference to controversial matters in an irritating manner. But in spite of that, a perusal of his letters reveals an honest desire that she should come back and live with him. He may have been mistaken in the method that he pursued, but I do not doubt that he was in earnest. The sending of the various books, pamphlets, cartoons, &c., may have been tactless, in bad taste, or worse, but neither singly nor together do they constitute cruelty, nor is the fact that he sent them sufficient to revive any act which had been condoned."

*Mr. Merritt Lane,* for the appellant.

*Messrs. McCarter & English,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion delivered by Advisory Master Reed in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, DEAR, WELLS, DILL, JJ. 12.

*For reversal*—None.